NO. B-0201118

| | | |
|---|---|---|
| SABINE STORAGE & OPERATIONS, INC. § | | IN THE DISTRICT COURT |
| § | | |
| v. § | | JEFFERSON COUNTY, TEXAS |
| § | | |
| THE DOW CHEMICAL COMPANY § | | 60TH JUDICIAL DISTRICT |

## THE DOW CHEMICAL COMPANY'S FIRST AMENDED ANSWER AND ORIGINAL COUNTERCLAIM

The Dow Chemical Company ("Dow" or "Defendant") files this First Amended Answer and Jury Demand, and Original Counterclaim.

### I.   FACTUAL ALLEGATIONS

**A.   DOW SELECTED SABINE TO DESIGN AND COMPLETE A WELL**

1. In 2016, Dow solicited competitive bids for the design, installation and permitting of a Class 1 Hazardous Waste Injection Well at Dow's aniline facility in Beaumont, Texas ("WDW 391").

2. Class 1 Hazardous Waste Injection Wells are subject to both federal and Texas law and their creation requires coordination with and approval from both the Texas Commission on Environmental Quality ("TCEQ") and the United States Environmental Protection Agency ("EPA").[1] The permitting requirements for these wells are more onerous than for many other types of wells, and they cannot be used until the TCEQ and EPA approve a use permit.

3. On October 11, 2016, Plaintiff/Counter-Defendant Sabine Storage & Operations, Inc. ("Sabine") submitted a proposal to Dow for materials, labor, sub-contractor management and professional services required to design, install, permit, and receive approval for WDW 391. In its proposal, Sabine represented that it was an expert in the design, drilling, completion and permitting of Class 1 Hazardous Waste Injection Wells and that the cost of the design, installation, permitting

---

[1]   *See, e.g.*, Texas Administrative Code, Title 30, Part 1, Chapter 333 and 40 C.F.R. § 146.65.

1

and approval for WDW 391 would be $3,583,160 as a baseline estimate, and $4,047,349 with contingencies.

4. Dow agreed to use Sabine for WDW 391 based on these representations.

**B.     SABINE AGREED TO COMPLETE WDW 391 FOR $3.6 MILLION**

5. On October 21, 2016, Dow and Sabine entered into Purchase Order No. 4504902220 (the "Purchase Order") for materials, labor, sub-contractor management and professional services required for the design, installation, and permitting of WDW 391.

6. In the Purchase Order, Sabine agreed:

- "to provide materials, labor, sub-contractor management and professional services required for the design and installation of injection well WDW 391 . . . .";

- that "installation, design, testing and reporting to comply with TCEQ permit for WDW 391. . . . ";

- that Sabine would be "responsible for giving proper notification to the TCEQ as defined in the WDW 391 permit prior to initiating specific well installation steps. . . ." ; and that

- "goods furnished or services rendered under this [Purchase] Order shall be (a) of the quality and applicable specifications stated in this Order, [and] (b) free from all defects in design, workmanship, and materials . . . ."

7. The Purchase Order lists a price of $3,583,160 and states: "Payment subject to standard Dow [Terms and Conditions] and will be on a cost reimbursable basis with timesheets and materials receivers submitted to Dow project manager on a weekly basis for review and approval."

8. The Dow Terms and Conditions, which were attached to the Purchase Order, state that "[t]his order may not be performed at higher prices than last quoted to [Dow] without notice and acceptance by [Dow]."

2

**C.     SABINE MISMANAGED WDW 391**

9. Based on Sabine's representations about its expertise, Dow allowed Sabine to select all of the sub-contractors, equipment and professional services to design and install WDW 391.

10. Based on Sabine's representations about its expertise, Dow also allowed Sabine to control the day-to-day management of the drilling and installation of the well necessary to receive approval by the TCEQ and EPA.

11. Sabine represented to Dow that the actual drilling of the well would take about 53 days. It took 91 days.

12. The main cause for this 38-day delay was that Sabine chose to use drilling rig and drilling solids handling equipment[2] that were not big enough for this job. If Sabine had the expertise that it represented in its proposal to Dow, it knew or should have known that this rig and its associated equipment were not big enough to drill WDW 391. During the drilling, Sabine attempted to blame its use of this undersized equipment on the limited space available at the WDW 391 well site. However, Sabine had visited the site and was aware of the location and any associated space limitations of this site before providing its proposal to Dow. Sabine never suggested that Dow consider another location.

13. Sabine incurred additional expense and delay because it "stuck" the drill bit as the well was approaching total depth. This required a time-consuming and expensive "fishing" expedition. On information and belief, the drill bit got "stuck" because Sabine failed to use an appropriate fluid system while drilling through the underground formations at the well site.

---

[2] Sabine used the Moncla Rig #3, which is a Wilson Model 75 "Drive-In Unit" with associated drilling solids handling equipment.

**D.     SABINE HID THE TRUTH ABOUT ITS FAILURES FROM DOW**

14. One of the critical elements of drilling and completing a Class 1 Hazardous Waste Injection Well is that the casing be adequately cemented. The casing is essentially the pipe through which the waste will ultimately flow, and it is cemented into the drilled hole. The adequacy of the cementing is demonstrated through appropriate interpretive logs submitted to the TCEQ and EPA. Sabine knew, or should have known, that the TCEQ and EPA are particularly sensitive to the adequacy of the cementing, because that cement operates as a barrier to ensure the material being injected does not escape from the well into the surrounding formations.

15. Sabine knew, or should have known, that the TCEQ and EPA require various tests be performed, including but not limited to a "Cement Bond Log" to demonstrate adequate cement bonding prior to final approval of the well. A Cement Bond Log does not directly measure cement quality. Rather, quality is inferred from an interpretation of acoustic waves generated by a transmitter. Sabine knew, or should have known, the TCEQ and EPA will not approve a Class 1 Hazardous Waste Injection Well if there is any question concerning these interpretive tests, even though the tests performed are interpretive and an adequate cement job may exist despite the interpretive results.

16. Sabine hired Baker Hughes to perform a Cement Bond Log on the surface and protection casings in WDW 391.

17. On May 3, 2017, Baker Hughes provided an interpretation letter to Sabine indicating a "poor cement bond" in the entire interval of the surface casing.

18. On May 28, 2017, Baker Hughes provided an interpretation letter to Sabine indicating "poor" and "poor to partial" cement bond in the protective casing for the entire interval of the protection casing.

19. Sabine knew, or should have known, that the TCEQ and EPA would ultimately require the disclosure of the Cement Bond Log interpretation letters as part of the approval process. Sabine knew, or should have known, that the Cement Bond Log interpretation letters would cause the TCEQ and EPA to question the validity of the cement bond.

20. Sabine did not inform Dow that there was an issue with the Cement Bond Log in May 2017. Instead, Sabine hid the results of the Cement Bond Logs, and the interpretation letters, from Dow. Dow did not discover the issue until December 2017, months after the well was "completed" and the TCEQ demanded the Baker Hughes interpretation letters be produced. Indeed, Sabine refused to produce the letters to Dow, and Dow had to obtain them directly from Baker Hughes in January 2018.

21. No "expert" responsible for the drilling, completion and permitting of a Class 1 Hazardous Waste Injection Well would receive Cement Bond Log interpretation letters like those received by Sabine, ignore them, and simply "keep on drilling," all while hiding them from the owner of the well. But that is exactly what Sabine chose to do.

22. Dow informed Sabine (through its counsel) about the Cement Bond Log issue with the TCEQ. Sabine argued that other tests, specifically the radioactive tracer log and the actual cement weight at the surface, showed adequate cement in the surface and protection casing. Dow offered to allow Sabine to present those arguments to the TCEQ. Sabine refused. Dow made Sabine's arguments to the TCEQ on June 1, 2018. The TCEQ rejected those arguments.

23. The TCEQ's formal position is that the well currently does not demonstrate the ability to provide sufficient protection in the surface and/or protection casing due to the Cement Bond Logs. As a result, the TCEQ has required Dow to submit a plan to address the TCEQ's concerns. That plan is currently being developed. However, it is abundantly clear that Dow will

incur significant costs in remediating the problem caused by Sabine's poor craftsmanship in performing its work and its concealment of the Cement Bond Log issues.

24. Dow does not get to determine whether the WDW 391 will ultimately be used for its intended purpose. That decision is completely up to the TCEQ and the EPA. It is currently estimated a remediation program will cost more than $2.2 million. But even if Dow spends millions of dollars trying to remediate the problems at WDW 391, the TCEQ and EPA may ultimately determine WDW 391 can *never* be used, and Dow will be stuck with an unusable hole in the ground for which it paid Sabine millions of dollars. Dow's expenses, directly related to Sabine's breaches, would continue since Dow must continue pouring money down the WDW 391 hole until the TCEQ and EPA are satisfied.

### E. SABINE EXPECTS DOW TO PAY $9.5 MILLION, MORE THAN TWICE THE AGREED PRICE, FOR AN UNUSABLE HOLE IN THE GROUND.

25. Because of the mismanagement described above and other failures by Sabine, WDW 391 cannot be used for its intended purpose.

26. Nevertheless, Sabine claims to have incurred a total cost of $9.5 million for its work on WDW 391.

27. Dow has already paid Sabine $5.9 million for WDW 391.

28. However, Dow ultimately rejected Sabine's invoices beginning in June 2017 and demanded that Sabine explain why a project managed exclusively by Sabine, upon whom Dow relied, was costing several times the "not to exceed" price expressly stated in the Purchase Order.

29. Sabine has never explained why a project it represented could be completed for $4.07 million "with contingencies" could cost $9.5 million.

6

30. If Sabine had informed Dow that WDW 391 would cost $9.5 million instead of the agreed-upon $4.07 million, Dow would have never selected Sabine to manage and carry out this job.

31. Put simply, Dow has paid Sabine $5.9 million for a hole in the ground that it cannot use (and may never be able to use unless Dow spends millions of dollars more), all because Sabine failed to properly manage and carry out the project, and then hid the truth about its failures from Dow.

## II.   FIRST AMENDED ANSWER

### A.   GENERAL DENIAL

32. Pursuant to Texas Rule of Civil Procedure 92, Dow generally denies the material allegations set forth in Plaintiff's Original Petition. Plaintiff therefore must prove these allegations to the jury by the greater weight of the believable evidence, as required by the Constitution and laws of this State.

### B.   AFFIRMATIVE DEFENSES

33. Dow asserts waiver as an affirmative defense.

34. Dow asserts contributory negligence as an affirmative defense.

35. Dow asserts estoppel as an affirmative defense.

36. Dow asserts fraud as an affirmative defense.

37. Dow asserts fraudulent inducement as an affirmative defense.

38. Dow asserts payment as an affirmative defense.

39. To the extent that Plaintiff has failed to mitigate its damages, Dow asserts failure to mitigate as an affirmative defense.

40. Dow reserves the right to file amended pleadings in this case in accordance with the Texas Rules of Civil Procedure.

### III. ORIGINAL COUNTERCLAIM

**A. COUNT I: BREACH OF CONTRACT**

41. Dow incorporates by reference paragraphs 1 through 31 above.

42. Sabine breached the Purchase Order by not providing services that satisfied its contractual obligations. Sabine failed to provide the necessary professional services required under the Purchase Order to construct a well that the TCEQ and EPA could approve, failed to provide the services in accordance with the quality and specifications set forth in the Purchase Order, and failed to provide services that were free of defects. Moreover, Sabine failed to provide notice to Dow and/or the TCEQ of the cement bond issues at the time that they were discovered. Sabine further failed to satisfy its obligation to only incur costs that were reasonable and necessary in a reimbursable contract. And Sabine refused to provide Dow with the necessary documentation required to obtain a TCEQ permit.

43. Dow incurred substantial damages because of Sabine's breach of contract. Sabine is liable for the damages caused by its breach.

**B. COUNT II: BREACH OF EXPRESS WARRANTY**

44. Dow incorporates by reference paragraphs 1 through 31 above.

45. The Purchase Order between Dow and Sabine contained an express warranty stating that the "goods furnished, or services rendered under this [Purchase] Order shall be (a) of the quality and applicable specifications stated in this Order, [and] (b) free from all defects in design, workmanship, and materials . . . ." Sabine breached the express warranty provided in the Purchase Order by failing to meet its warranty obligations.

8

46. Dow was injured by the breach of warranty and has sustained, and will continue to sustain, injuries due to Sabine's breach of its warranty, including but not limited to the costs to repair, remediate, and/or rebuild a well that will meet with the regulatory requirements of the TCEQ and the EPA.

C.     **COUNT III: BREACH OF THE IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE**

47. Dow incorporates by reference paragraphs 1 through 31 above.

48. Sabine owed Dow a duty to perform its services in a good and workmanlike manner.

49. Sabine breached this duty by failing to provide the quality of work that a contractor with the knowledge, training, or experience necessary for the successful installation of a Class 1 Hazardous Waste Injection well should have, and by failing to perform the work in a proficient manner.

50. Dow was injured by the breach of its implied warranty and has sustained, and will continue to sustain, injuries due to Sabine's breach of the implied warranty, including but not limited to the costs to repair, remediate, and/or rebuild a well that will meet with the regulatory requirements of the TCEQ and the EPA.

D.     **COUNT IV: FRAUDULENT INDUCEMENT**

51. Dow incorporates by reference paragraphs 1 through 31 above.

52. Sabine induced Dow to enter the Purchase Order by representing that it had experience in constructing Class 1 Hazardous Waste Injection wells. Sabine further induced Dow to enter the Purchase Order by submitting a bid that estimated the project to construct WDW 391 would be $3,583,160 as a baseline estimate, and $4,047,349 with contingencies. Sabine knew that these representations were false or made them recklessly without any knowledge of their truth and

as positive assertions. Sabine intended Dow to rely on these representations in deciding to enter the Purchase Order with Sabine. Dow relied on these misrepresentations in deciding to enter the Purchase Order with Sabine. Dow was injured because of its reasonable reliance on Sabine's misrepresentations.

### E.   COUNT V: UNJUST ENRICHMENT

53. Dow incorporates by reference paragraphs 1 through 31 above.

54. Sabine obtained a benefit from Dow by fraud, or by the taking of an undue advantage, which would be unconscionable to retain. Accordingly, Sabine should be disgorged of its unjust enrichment to the extent Dow cannot receive approval for the use of WDW 391.

### F.   COUNT VI:  ATTORNEYS' FEES

55. Dow incorporates by reference paragraphs 1 through 31 above.

56. Pursuant to the Purchase Order, Dow is entitled to recover its reasonable attorneys' fees, costs, and expenses.

57. Moreover, Dow is entitled to recover attorneys' fees pursuant to Texas Civil Practice and Remedies Code Section 38.001 as Dow is bringing a claim against Sabine, a corporation, on a written contract.

### G.   DAMAGES

58. Dow has been damaged by Sabine's breach of the Purchase Order, failure to adhere to representations and warranties contained therein and by its fraudulent inducement. Dow's total damages are indeterminate at this point as the TCEQ and EPA have not approved WDW 391 for use, and Dow is in the process of remediating Sabine's breach to gain approval.

## IV.  JURY DEMAND

59. Dow respectfully requests trial by jury on all contested issues of fact.  The requisite jury fee has been paid.

## V.  PRAYER FOR RELIEF

60. Dow prays that upon final trial and hearing in this case, Sabine takes nothing by reason of this suit.  Dow further prays that it recovers the damages that it sustained because of Sabine's breach of contract, breach of express warranty, and fraudulent inducement.  Dow prays that upon final trial and hearing in this case, it recovers its damages caused by Sabine and reasonable and necessary attorneys' fees, costs and expenses, and for all other relief to which it is entitled.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE, PLLC


By: */s/ Kevin Jordan*
Kevin Jordan
State Bar No. 11014800
Caroline Carter
State Bar No. 24078318
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: 713.955.4022
Facsimile: 713.955.9644
kjordan@jlcfirm.com
ccarter@jlcfirm.com

ATTORNEYS FOR DEFENDANT
THE DOW CHEMICAL COMPANY

CERTIFICATE OF SERVICE

        This certifies that a copy of the above and foregoing was sent to all known counsel of record by means of the Court's electronic filing system on the 19th day of July, 2018.

                                    */s/ Caroline Carter*
                                    Caroline Carter